## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                  No. CR 12-0152 JB

RODNEY CHAVEZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Notice of Intention to Introduce

Coconspirator Statements and Request for James Hearing, filed January 7, 2013 (Doc. 107).  The

Court held a James hearing on June 18, 2013.[1]  The primary issue is whether certain statements

that Defendant Rodney Chavez' co-Defendant, Joshua Ellis, made in electronic mail

transmissions to investors are admissible as non-hearsay coconspirator statements.  At the James

hearing, Chavez conceded that a preponderance of the evidence establishes that he and Ellis

agreed to work together in the business of selling the investors' properties in Puerto Peñasco,

Sonora, Mexico, but contended that there was no proof that their activity was criminal.  Because

Chavez used a false name when he spoke to the investors and to their representative, because

---

[1]  A "James hearing" refers to a hearing that the Court holds to determine whether a
preponderance of the evidence demonstrates that the out of court statements of a defendant's
alleged coconspirators fall within rule 801(d)(2)(E) of the Federal Rules of Evidence's exclusion
of coconspirator statements from the definition of hearsay.  The hearing is named for the United
States Court of Appeals for the Fifth Circuit's decision in United States v. James, 590 F.2d 575
(5th Cir. 1979), in which the Fifth Circuit held that, under rule 104(a), the trial court must make
the determination whether the foundations for coconspirator statements have been met and must
make this finding by a preponderance of the evidence before the admitting the statements.  See
590 F.2d at 578-82.

Ellis sought money from the investors to repatriate[2] the sales proceeds when those sales proceeds were already in the United States, and because Ellis signed these electronic mail transmissions using Chavez' assumed name and forwarded each of these electronic mail transmissions to Chavez, the Court concludes by a preponderance of the evidence that the activity was criminal, and that Chavez and Ellis conspired to commit wire fraud. The Court thus concludes that, given Ellis' statements that Plaintiff United States of America seeks to introduce from these electronic mail transmissions asking the investors for money to facilitate the transport of sales proceeds from Mexico to the United States of America, these statements were made in furtherance of Chavez and Ellis' conspiracy. Accordingly, the Court will admit against Chavez at trial, under rule 801(d)(2)(E), statements made in furtherance of the conspiracy.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982)("[U]nder Rule[] 104(a) . . . , the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'")(quoting United States v. Matlock, 415 U.S. 164, 174 (1974)). In deciding such preliminary questions, the other

---

[2] The New Oxford American Dictionary defines "repatriate" as to "send [something] back to [its] own country." New Oxford American Dictionary 1479 (Angus Stevenson & Christine A. Lindberg eds., 3d ed. 2010).

rules of evidence, except those with respect to privileges, do not bind the Court.  <u>See</u> Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so deciding, the court is not bound by evidence rules, except those on privilege.").  Thus, the Court may consider hearsay in ruling on a motion to suppress.  <u>Cf.</u> <u>United States v. Merritt</u>, 695 F.2d at 1269 ("The purpose of the suppression hearing was, of course, to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments. In this type of hearing the judge had latitude to receive it, notwithstanding the hearsay rule.").

1.     Puerto Peñasco Getaway ("PPG") was a limited liability company that Gilbert Lovato and Michael Celenze incorporated.  <u>See</u> Tr. at 16:6-7 (Bott)("Puerto Penasco get away I believe is a limited liability that was created by Gilbert Lovato and Michael Celenze and was used as an umbrella company to invest in properties in Puerto Penasco, Mexico.").

2.     Lovato and Celenze used PPG to invest in the properties in Puerto Peñasco.  <u>See</u> Tr. at 16:6-7 (Bott)("Puerto Penasco get away I believe is a limited liability that was created by Gilbert Lovato and Michael Celenze and was used as an umbrella company to invest in properties in Puerto Penasco, Mexico.").

3.     Lovato and Celenze created PPG in 2004 and began soliciting investors to purchase properties in Puerto Peñasco with the idea of paying the investors and making a large return on the investors' investment within five years.   <u>See</u> Tr. at 16:12-17 (Bott)("In approximately 2004, Gilbert Lovato and Michael Celenze . . . began soliciting investors in order to purchase properties in Puerto Penasco, Mexico, with the idea of in approximately five years

paying back the investors and making a large return . . . on investment for the original investors.").

4.      PPG primarily invested in condominiums, and also invested in some land located near the ocean in Puerto Peñasco.  See Tr. at 16:18-21 (Anderson, Bott)("Q.   And can you describe the type of properties that were invested in through PPG?"  "A.   They were basically condos, and there was some land that  was located near the ocean of Puerto Penasco, Mexico.").

5.      Thirty to thirty-five individuals invested approximately $7,000,000.00 in PPG, approximately $4,000,000.00 of which went into the properties.   See Tr. at 16:22-17:6 (Anderson, Bott)("Q.   And can I -- Approximately how many people invested in the properties you described?"  "A.   I believe approximately 30 -- 30 or 35. . . .   There was approximately $7 million collected . . . [,] approximately $4 million actually went into the properties . . . .").

6.      These investments did not take the form of one group making one investment, but rather were piecemeal, taking place over a period of time.  See Tr. at 45:14-17 (Davis, Bott)("Q. All right. But the idea was, is that these people . . . .   People were investing over a period of time. Is that right?"  "A.   Yes.").

7.      The investments were not all structured the same, but a number of the investors received contracts reflecting loans against the properties, a number were contracts for shares of the properties, some received promissory notes as contracts for their investments, and some contracts took the form of a real estate investment trust.  See Tr. at 44:21-45:13 (Davis, Bott) (Bott explaining that "investors gave money to Mike Celenze or Gilbert Lovato and they were given . . . written contracts . . . .   Some the contracts were loans against some of the properties; some of them were for shares of the properties. And it just depended on each individual person . .

. .” "Some contracts appeared to be promissory notes," and recalling that she saw "real estate investment trusts").

8.      Lovato and Celenze, rather than any of the investors, were the named members of the LLCs, which held title to the properties.  See Tr. at 47:1-11 (Davis, Bott)(in response to Chavez' question whether Celenze and Lovato set up the LLC's for themselves rather than for investors, Bott responded: "[W]hen you actually look at the title documents for the properties that the investors were not actually named on the actual title documents for the properties.").

9.      In early 2010, the PPG properties were in arrears of $42,970.80 for Homeowners Association dues.  See Tr. at 18:5-8 (Bott)("In early 2010 the investment properties were in arrears for HOA dues.  They were not being rented as much as they had anticipated due to the down fall of the economy and also some of the violence that Mexico was experiencing."); Electronic Mail Transmission from Lynda Saveski, Las Palmas Homeowners Association, to Gilbert Lovato at 1, dated January 22, 2010 (United States' Hearing Exhibit 2).

10.     In early 2010, Lovato was caretaker of the properties, spokesperson for the investors, the managing member of the PPG, and his name was on the titles for the companies. See Tr. at 18:19-24 (Bott)("Mr. Lovato . . . was basically taking care of the properties.  He was the spokesperson for the investors, and as far as the titles to the property, . . . he was the one that actually probably owned the limited liability companies and his name was on most of the titles for the properties.").

11.     Also in early 2010, Lovato devised an exit strategy from PPG's failing investments in Puerto Peñasco, and sent an electronic mail transmission to the investors stating that some of the investors had approached him about selling the properties for approximately

thirty cents on the dollar.  <u>See</u> Tr. at 19:1-7 (Anderson, Bott)("Q. . . . [I]n early 2010 did Mr. Lovato come up with a plan to exit the investment in Puerto Penasco?"  "A.  Yes. . . .  Lovato proposed to the investors to sell all of the properties that were owned out right for 30 cents on the dollar of the original investment."); Electronic Mail Transmission from Gilbert Lovato to the PPG Investors at 1-2, dated Mar. 2, 2010 (United States' Hearing Exhibit 3).

12.    Specifically, Lovato spoke with whom he believed to be Wayne Church, and the individual he believed to be Church stated that he could sell the properties for thirty cents on the dollar, and that, because he was a PPG investor, he should be given the chance to do so.  <u>See</u> Tr. at 19:19-25 (Bott)("Mr. Lovato also spoke with who he believed to be Wayne [C]hurch, and Mr. Church stated that he could sell the properties for 30 cents on the dollar, as well,  and that he should be given the chance, since he had an  interest in the properties.").

13.    Lovato's electronic mail transmission to the PPG investors states:

> I have been approached by a few PP Getaway investors who are willing to take thirty cents on the dollar for their interest in the Puerto Peñasco property and be willing to get this deal behind them.
>
> . . . .
>
> I will need an answer from all of you by Friday the 5th of March, so that we know what we need to do and hopefully move forward in getting this project behind us.

Electronic Mail Transmission from Gilbert Lovato to the PPG Investors at 1-2.

14.    Some investors responded to the electronic mail transmission, representing that they were willing to proceed with the sale.  <u>See</u> Tr. at 20:25-21:6 (Anderson, Bott)("Q.  Now . . . do you know whether Mr. Lovato received any responses to this update or offer?"  "A.   Yes, he did . . . .  I understand that there were investors willing to sell the properties for 30 cents on the dollar.").

15.     A few days after this electronic mail transmission to the investors, Lovato entered into an oral agreement to sell the properties with an individual that he believed to be Church. See Tr. at 21:7-13 (Anderson, Bott)("Q. . . . [F]ollowing this March 1 electronic mail transmission, did Mr. Lovato enter into an arrangement with an individual he knew by the name Wayne [C]hurch to sell the properties?"  "A.   Yes. . . .  An oral agreement."); id. at 21:20-24 (Anderson, Bott)("Q.  And do you know the approximate date of the agreement between -- Well I'll refer to him as Wayne church -- between Mr. Church and Mr. Lovato on behalf of the investors?"  "A.   I believe it was a couple days after this electronic mail transmission that is dated March 2nd.").

16.     The oral agreement into which Lovato and the individual he believed to be Church entered provided that Church would sell the properties, give the investors back thirty cents on the dollar of their original investment, and would then keep whatever money he received over the thirty cents per dollar in exchange for selling the properties.  See Tr. at 21:16-19 (Bott)("The agreement was to sell the properties and give the investors back 30 cents on the dollar of their original investment and whatever money he received for selling the properties above that he would be able to keep.").

17.     Chavez stated that he believed that thirty cents on the dollar equated to owing the investors at least a total of "$1.8 million."  Transcript of Recorded Telephone Conference of Wayne Church at 30:18-21, taken February 1, 2011 (United States' Hearing Exhibit 7)("Feb. 2011 Call").  See Tr. at 83:3-13 (Anderson, Bott)(Bott stating that her understanding of the agreement between Chavez and Lovato was that "to pay back 30 cents on the dollar would require $1.8 million").

- 7 -

18.     The individual that Lovato believed to be Wayne Church and with whom Lovato entered an oral agreement to sell the properties was Chavez.  See Tr. at 21:25-22:5 (Anderson, Bott)("Q. . . . [I]n the course of your investigation, did you identify the individual who held himself out as Wayne Church in the course of these negotiations?"  "A.  Yes, I did. . . .  That individual is Rodney Chavez.").

19.     There are several recorded telephone conversations in which Chavez -- representing himself as Church -- was speaking with Lovato about the sales of the properties.  See Trial Stipulation at 1 (United States' Hearing Exhibit 4); Tr. at 22:20-21 (Court)(taking judicial notice of the Trial Stipulation).

20.     To facilitate Chavez' ability to sell the properties, and to provide the individual that Lovato believed to be Church the ability to sign over the titles to the Puerto Peñasco properties, Lovato executed powers of attorney over various limited liability companies that held the rights to the Puerto Peñasco properties.  See Tr. at 23:1-16 (Anderson, Bott)("Q. . . .   After hiring the individual he believed to be Wayne [C]hurch to sell these properties, did Mr. Lovato execute certain documents in order to allow Mr. Church to sell the properties?"  "A.   Yes. . . . powers of attorney over various limited liability companies that owned the rights to the properties in Puerto Penasco, Mexico.").

21.     There is no evidence that use of the name Church, as opposed to any other name, including Chavez using his own name, affected the agreement to sell the properties for thirty cents on the dollar.  See Tr. at 54:6-8 (Davis, Bott)("Q. So you have no evidence that they relied on the fact that he was Wayne Church for entering into their agreement?"  "A. No.").

22.     There is also no evidence that Chavez ever used a fake document as a means of identification.   See Tr. at 71:6-19 (Davis, Bott)("I may have evidence that he used a false name. I don't have an actual document that shows, you know, his photo and the -- and the name of Wayne Church.").

23.     Chavez' use of the name Church rather than his own made it more difficult for the investors to identify the individual who had control of their properties and also made it more difficult for the Internal Revenue Service ("IRS") to identify who was conducting the underlying activities.   See Tr. at 81:13-82:7 (Anderson, Bott)("Q.   Did Mr. Chavez's use of the name Wayne Church make it more difficult for the investors to pinpoint and identify the individual who had control of their properties?" "A. Yes."  "Q. Now, in the course of your investigation, did Mr. Chavez's use of the name Wayne Church make it more difficult for you to identify who was conducting this activity?"  "A. Yes.").

24.     After Lovato turned over the properties to Chavez, the properties that PPG and the other limited liability companies owned outright were sold.   See Tr. at 23:17-23 (Anderson, Bott)(" Q.   . . .  [W]ere you able to determine what happened to[] the properties in Puerto Penasco after they were effectively turned over to Mr. Chavez for him to sell on behalf of the investors?"  "A.   The properties that were owned out right by the -- by Puerto Penasco [Getaway] and by the other various limited liability companies were sold."); Summary of Disbursements at 1-5 (United States' Hearing Exhibit 6).

25.     The total proceeds received for the sale of the properties, after the closing costs, lawyer fees, and owed HOA fees were paid out of the sale, was $847,370.52.  See Summary of Disposition of Funds, Summary of Disbursements at 5; Tr. at 72:10-13 (Bott)(noting that, in

reference to total proceeds: "The gross amount was larger than that; however, a lot of the fees associated with selling the properties came out of that, so the net amount that went into the Inspirational account was eight-hundred-and-forty-seven-thousand and some change.").

       **1.**       <u>The Money from the Proceeds of the Sales of the Properties</u>.

26.     Those proceeds were transferred from the title companies at the properties' closings into Inspirational Equities' bank account at Peoples Bank.  <u>See</u> Tr. at 25:7-11 (Anderson, Bott)("Q.   Now, upon the sale of all the . . . [properties], where did the proceeds -- what ac[coun]t were the proceeds transferred into?"  "A.   The proceeds were wired into the [I]nspirational [equities] account at People's Bank."); Tr. at 25:23-26:2 (Anderson, Bott)("Q. And Agent Bott, what is your understanding of the account from which the money was sent into the [I]nspirational [E]quities account?  In other words, where did it come from?"  "A.   The proceeds came from the title companies that clo[]sed the sale of the properties.").

27.     Chavez is the only signatory to the Inspirational Equities account to which the proceeds were transferred.  <u>See</u> Tr. at 25:14 (Bott)("Rod Chavez was the only signator[y] on that account."); Peoples Bank Account Documents for Inspirational Equities at 1 (United States' Hearing Exhibit 5).

28.     None of the original investors received any of the proceeds that were deposited in the Inspirational Equities account.  <u>See</u> Tr. at 26:5-8 (Anderson, Bott)("Q.   Now Agent Bott we just talked about a number of deposits of a number of proceeds.  Did any of the original investors in Puerto Penasco ever receive any of these proceeds?"  "A.   No.").

29.     "[A]pproximately $590,000.00 of the monies were spent," with some of the proceeds going to Church, some going to Chavez' family members, some to Chavez' additional

personal bank accounts and to other businesses for which Chavez was a signatory, some to Chavez, some went to Chavez' girlfriend, Alicia Gallegos, and some to Ellis.  Tr. at 26:12-19 (Bott).[3]  See Summary of Disposition of Funds, Summary of Disbursements at 5; Tr. at 26:20-24 (Anderson, Bott)(Bott answering in the affirmative to the question whether the Summary of Disposition of Funds "accurately reflect[s] the places that various sums of money went from the proceeds of the sales").

30.     The IRS obtained a seizure warrant and seized the remaining approximately $220,000.00 of proceeds from the Inspirational Equities account, because the IRS believed the funds would otherwise be spent in the same manner of as the previous approximately $590,000.00.  See Tr. at 27:10-20 (Anderson, Bott)("I sought and obtained the warrant for the remaining funds because I believed the remaining funds would be spent in the same manner if the Government did not seize the funds."  "Q.   And approximately how much money did you seize from the inspirational equities account through that warrant?" "A.   Approximately $220,000.").

31.     The IRS identified proceeds from the sale of the Puerto Peñasco properties in two other companies that Chavez owned and also seized the proceeds from those accounts.  See Tr. at

---

[3] In response to the United States' question if Bott could provide an approximate summary of what happened to the proceeds, Bott responded:

> Well approximately $590,000 of the monies were spent.  Some of them going to Wayne church, some of them going to  family members of Rodney Chavez, some of them going into  business accounts that he was a signer on.  Some the money also appears to have gone to associates of Rodney Chavez.  Some the money went to his girlfriend Alicia Gallegos, and some of the money went to Jos[hua] Ellis.

Tr. at 26:9-19 (Anderson, Bott).

27:25-28:2 ("There were funds present in two other -- two other companies that Rodney Chavez owned, and we seized the funds from those accounts, as well.").

32.     Ellis received approximately $65,000.00 of the proceeds from the properties' sales.  See Tr. at 36:4-7 (Anderson, Bott)("Q.   Agent Bott, let me refer back, if I could, to Exhibit 6, the last page there.   How much money did you find that Mr. Ellis received representing proceeds of these sales?"  "A.  Approximately $65,000."); Summary of Disposition of Funds, Summary of Disbursements at 5.

### 2.     The February 1, 2011, Telephone Conference Call.

33.     In February, 2011, Lovato recorded a conference call in which he and Chavez -- under the name Church -- were involved.  See Feb. 2011 Call at 1; Trial Stipulation at 1 (Chavez stipulating that the speaker identified as Wayne Church in the telephone call with the bates number corresponding to the Feb. 2011 Call was Chavez and not Church).

34.     During that conference call, Chavez told the other persons on the conference call that he "work[s] with a fella named Joshua Ellis.   He's the one that takes care of everything down there."  Feb. 2011 Call 21:7-8 (Church).

35.     Ellis' role included researching the properties in Puerto Peñasco, watching over some of the properties -- including living in of the villas -- and working with realtors in Puerto Peñasco to try to sell some of the properties.  See Tr. at 29:11-18 (Bott).[4]

---

[4] In response to the United States' question what Bott understood to be Ellis' role in the operation, Bott responded:

My understanding was that Jos[hua] Ellis was doing some research on the properties down in Puerto Penasco, Mexico, and was also watching over some of the properties.  He was actually living in vi[ll]a 1, what they call squatting the property, so that other people that . . . had rights to the property would not take

- 12 -

36.     Also during the conference call, Chavez told the other callers that Villa 16 had been sold and that the money from the proceeds was in a United States bank account waiting to be disbursed.  See Feb. 2011 Call 24:6-15; Tr. at 29:24-30:2 (Anderson, Bott).

37.     That statement to the callers about Casa 16 was not true, because the money from the proceeds had already been spent.  See Tr. at 30:3-10 (Anderson, Bott)(Bott testifying that the statement was not true, "[b]ecause the money from the proceeds of the sale of casa 16 was spent"); Summary of Villa 16 Disbursement, Summary of Disbursements at 1; Tr. at 30:11-12 (Bott noting that the use of the proceeds from the sale are reflected on the first page of Summary of Disbursements at 1).

38.     There was, however, approximately $60,000.00 from properties other than Casa 16 in various accounts at the time that Chavez made this statement.  See Tr. at 77:20-78:3 (Davis, Bott)(Bott explaining that "[t]here may have been some money sitting in there, but not -- not the proceeds from the sale of Casa 16," and concluding that there was "[a]pproximately $60,000" in the various accounts at the time).

39.     Also in the conference call, Chavez discussed with an unidentified female his previous requests that the investors contribute money to "repatriate the funds."  Feb. 2011 Call 23:5-11.  See Tr. at 31:19-32:7 (Anderson, Bott).

40.     Later on in the conference call, Chavez stated that the sold properties are being purchased in Mexico with cash, and that he is "using a friend of Joshua Ellis that has a tequila

---

the property.  It was also my understanding that he was working with some of the realtors down there to help . . .  try and sell the properties.

Tr. at 29:11-18 (Bott).

factory" to repatriate the money.  Feb. 2011 Call at 38:13-17.  See Tr. at 30:18-31:3 (Anderson, Bott).

41.     The statements about Chavez' need to repatriate the money were not true, because "the money from the proceeds of the sales of the properties was never in Mexico."  Tr. at 31:15-16 (Bott).

### 3.     The Recorded Telephone Call Between Chavez and Lovato in which Chavez Says that the Money for Proceeds from Villa 16 is in a Trust Account.

42.     In a later telephone call between Chavez and Lovato, when Lovato asks whether Chavez received the money for Villa "16 and all the penthouses," Chavez responds that he has received "most of it."  Transcript of Recorded Telephone Call with Wayne Church Where Church States that the Money is in Account at 3:15-17 (United States' Hearing Exhibit 8)("Villa 16 Account Call").

43.     When Lovato asked about the money, Chavez states that all of the money is in the United States and, after further questioning, stated that it is in a particular account and ready to go.  See Villa 16 Account Call at 3:15-4:9.

44.     Chavez' statements to Lovato on this telephone call are "inconsistent" with the account information related to the sales proceeds, because "as soon as the proceeds of the properties were received into the [I]nspirational account the money was spent."  Tr. at 33:20-34:2 (Anderson, Bott).

### 4.     The Money Seizure Conversation.

45.     In another recorded telephone call, Chavez informed Lovato that the IRS seized the money in the Inspirational Equities account and two other accounts, and told Lovato that it is not fair to Lovato and Chavez, because they "probably won't see nothing" now.  Transcript of

Recorded Telephone Call with Wayne Church About Money Seizure at 3:1-2, 7:21-8:4 ("Seizure Call").

46.     Chavez' statements in the recorded telephone call representing that he and Lovato would not see any proceeds from the sales is inconsistent with his bank records.[5]

47.     Chavez also told Lovato that there is "a chunk of money out there . . . that still need[s] to get paid out" to the investors.  Seizure Call at 22:1-4.

48.     This statement was also inconsistent with Chavez' bank records.  See Tr. at 35:23-36:2 (Anderson, Bott)("Q. . . .  Agent Bott[,] in the course of your investigation[,] did you find any evidence that there was other money out there[,] proceeds of other properties that you hadn't found?"  "A.  No.").

49.     The IRS did not encourage Lovato to record these telephone calls, and the IRS does not know if Lovato recorded other telephone calls which he did not report to the IRS.  See Tr. at 55:1-9 (Davis, Bott)("Q. At any point, did you encourage Gilbert Lovato to continue recording phone calls?"  "A. No."  "Q. All right. . . .  You don't know if there were any other calls that were made that Mr. Lovato didn't record?" "A. I don't.").

**5.     Telephone Calls Related to Providing the Money to IRS Agent Rebekah Bott or Lovato's Attorney, Jason Bowles.**

---

[5] IRS Agent Rebekah Bott testified:

[H]e is stating that if he paid out the investors at this time then he would not be getting paid for all of his efforts; however, according to the bank records, he had spent all of the proceeds of the investment prospects and there was no money to give to the investors.

Tr. at 35:15-19 (Bott).

50.     During a number of telephone conversations after the IRS seized the remaining funds from Chavez' bank accounts that Lovato recorded, Chavez discussed with Lovato the options of providing the proceeds of future sales of the properties to Bott or to Mr. Bowles.  See Chavez' Supplement Telephone Call No. 1960, filed June 25, 2013 (Doc. 193-1)("Supp. Telephone Call No. 1960"); Chavez' Supplement Telephone Call No. 1963, filed June 25, 2013 (Doc. 193-2)("Supp. Telephone Call No. 1963"); Chavez' Supplement Telephone Call No. 1965, filed June 25, 2013 (Doc. 193-3)("Supp. Telephone Call No. 1965"); Chavez' Supplement Telephone Call No. 1967, filed June 25, 2013 (Doc. 193-4)("Supp. Telephone Call No. 1967"); Chavez' Supplement Telephone Call No. 1973, filed June 25, 2013 (Doc. 193-5)("Supp. Telephone Call No. 1973").

51.     The IRS had already seized the bank account funds at the time of these calls, because in each of these telephone calls Chavez references the seizure.  See Supp. Telephone Call No. 1960 at 8:6-7 ("Listen, and how I know its frozen is they seized the money that was there.")(United States' Hearing Exhibit 10); Supp. Telephone Call No. 1963 at 2:19-20 ("I could go to Jason Bowles or I could go to the other account that was seized."); Supp. Telephone Call No. 1965 at 3:17-18 ("If not, we'll get it to Hawley, and if they seize it, they seize it."); Supp. Telephone Call No. 1967 at 3:12-15 ("I mean, we're going to send everything over and we're going to get what we can get.  I mean, we don't have no[] control over whether it gets seized or not.")(United States' Hearing Exhibit 13); Supp. Telephone Call No. 1973 at 27:1-2 ("Because after the million-and-one and after what she seized, there ain't no more.")(United States' Hearing Exhibit 14).

52.     In Supp. Telephone Call No. 1960 and Supp. Telephone Call No. 1973, Chavez discussed sending proceeds from the sale of one of the PPG properties to Bott.  See Supp. Telephone Call No. 1960 at 7:5-7 ("[T]hey don't care if we send all the rest of this money to Rebekah Bott.  Then let's just do that, then."); Supp. Telephone Call No. 1973 at 7:14-15 ("He's like, 'okay, well, then give it to Rebekah.'  Well, then, fine, I'll give it to Rebekah"); id. at 26:9-11 ("I'm going to go ahead and send this money, but I think I'm just going to send it to Rebekah . . . .").

53.     In Supp. Telephone Call No. 1963, Supp. Telephone Call No. 1965, and in Supp. Telephone Call No. 1967, Chavez discusses sending proceeds from the sale to Mr. Bowles.  See e.g., Supp. Telephone Call No. 1963 at 2:3-5 ("Hey Mr. Lovato, I know you're busy, but, hey, what if we put the rest of that money at least in Jason Bowles account?"); Supp. Telephone Call No. 1965 at 2:8-11 ("You know, I'm . . . I'm going to make sure I'm going to pay out this 1.1 to Jason and we're going to pay everybody off and we're going to get paid ourselves, of course, because we don't work for free."); Supp. Telephone Call No. 1967 at 4:4-7 ("[I]t would be nice to know that Mr. Bowles said, 'Yeah, go ahead and put it in there, I'll go ahead and disperse it.' You know what I mean?").

**6.     The Electronic Mail Transmissions That Contain the Alleged Co-Conspirator Statements.**

54.     During the IRS investigation, several electronic mail transmission accounts were identified as being controlled by Joshua Ellis, including a Hotmail account -- elgitervo@hotmail.com -- and an America Online account -- elkatervo@aol.com.  See Tr. at 36:8-37:5 (Anderson Bott)(discussing Bott's identification of Hotmail and AOL electronic mail transmission addresses belonging to Joshua Ellis, and identifying the United States' Exhibit 15 as

containing Ellis' Hotmail electronic mail transmission address); "FW: wayne church", Electronic

Mail Transmission from Joshua Ellis to Rodney Chavez, dated Sept. 26, 2010 (United States'

Exhibit 15).

55.     In the September 26, 2010, "FW: wayne church" electronic mail transmission,

Ellis is forwarding to Chavez an electronic mail transmission that Ellis had originally sent to the

PPG investors, in which he wrote "Wayne Church" in the signature line.  FW: wayne church at

1.  See Tr. at 37:4-14 (Anderson, Bott)(Bott testifying that Ellis is using Wayne Chavez' identity

to send the electronic mail transmission, is sending it to "PP get away," and then forwarded to

"[R]od Chavez").

56.     Ellis, signing the electronic mail transmission as Church, is seeking additional

money from the investors under the premise that the funds will be used to get the proceeds of the

properties' sales back into the United States.   See FW: wayne church at 1; Tr. at 37:22-24

(Bott)("Jos[hua] Ellis is soliciting additional funds from the investors in order to get the proceeds

of the sale of the properties back to the United States.").

57.     There was no need for additional investor money.   See Tr. at 36:25-37:3 ("Q.

And, again, just to make sure I understood your earlier testimony, there was no need for that in

this case. Is that correct?"  "A.  Yes.").

58.     In a second electronic mail transmission that Ellis forwarded to Chavez, also

originated on September 26, 2010, titled "FW: wayne church…thank you," and also signed as

"Wayne Church," the electronic mail transmission string begins with Ellis -- representing

himself as Church -- telling "Joan," one of the PPG investors, that he is "happy" she could help

with "this last step to recovery of the money," and that he needed "4,000 dollars" to repatriate

the money.  "FW: wayne church", Electronic Mail Transmission from Joshua Ellis to Rodney Chavez, dated Sept. 26, 2010 (United States' Hearing Exhibit 16).  See Tr. at 38:6-13 (Bott).

59.  In a different, third electronic mail transmission string originating also on September 26, 2010, with the subject heading, "FW: contact info wayne church", which Ellis forwarded to Chavez, Ellis states: "Plus I sold the properties the money is here . . . ."  "FW: contact info wayne church", Electronic Mail Transmission from Joshua Ellis to Rodney Chavez, dated Sept. 26, 2010 (United States' Hearing Exhibit 18).

60.  The representation that the properties had been sold, according to the account records, was inaccurate, because the properties, as of September 26, 2010, had not yet been sold. See Tr.at 39:13-21 (Bott)("Mr. Ellis is lying, because the properties were not sold at this time.").

61.  In a July 23, 2010 electronic mail transmission from Ellis to Chavez, with a subject line reading, "Rvr: las palmas", Ellis tells "rod" that "it is very likely that las palmas is sold or at least Casa 1 hard cash money," but does not mention any need or issue in relation to repatriating the money.  "Rvr: las palmas", Electronic Mail Transmission from Joshua Ellis to Rodney Chavez, dated July 23, 2010 (United States' Hearing Exhibit 22).  See Tr. at 40:4-18 (Anderson, Bott)(Bott identifying the electronic mail transmission as addressed to "shadowsystems2010@gmail.com," sent to "Rod," and noting that there is not "any mention in this electronic mail transmission of the need to repatriate the money").

62.  In the "Rvr: las palmas" electronic mail transmission, there was also no mention of the need to hire a broker to assist with the repatriation of the money.  See "Rvr: las palmas" at 1; Tr. at 40:19-21 (Anderson, Bott).

63.     In another electronic mail transmission, with a subject line reading "las palmas resort," Ellis, this time, given that he was no sending the electronic mail transmission to the investors, but rather apparently to a prospective buyer, sent the electronic mail transmission as himself rather than as Church, stated that the investors "would also be interested in trade" in place of sale of the properties, which the IRS investigation found to be inconsistent with investor expectations.   "las palmas resort", Electronic Mail Transmission from Joshua Ellis to ikentfinancial@financier.com, dated Oct. 27, 2010 (United States' Exhibit 24).  See Tr. at 40:22-41:19 (Anderson, Bott)(Bott stating that the representation about trade "is inconsistent . . . with the representations that was made to the investors," because "the investors were not interested in trade").

64.     In every electronic mail transmission that Ellis writes to the investors, he signs these electronic mail transmissions as Rodney Chavez.  See "FW: wayne church" at 1; "FW: wayne church…thank you" at 1; "FW: contact info wayne church" at 1.

65.     In an electronic mail transmission, with the subject line "Money," dated September 15, 2010, which purports be from Church at ppgetaway@ymail.com, and is addressed to elkatervo@aol.com, the text of the electronic mail transmission discusses some of the properties and warns the reader not to use "my name" ever:

> Brother, get at me early to get that money and we need to get on it tomorrow make it a good day plus stay safe out there for the holidays.  Your right lets sell everything but casa 16 I want to find some nice properties for us.  Do you think Brett is real with that Puerto Vallarta deal I want that house bad. Oh don't use my name on the computer ever thanks.

"Money", Electronic mail transmission from ppgetaway@ymail.com elkatervo@aol.com, dated Sept. 15, 2010 (United States' Exhibit 25).

- 20 -

66.     Chavez     controlled     the     electronic     mail     transmission     address
ppgetaway@ymail.com under the primary electronic mail transmission account with the address
shadowsystems2010@gmail.com.  See Tr. at 42:17-23 (Anderson, Bott)("Q.  Now, Agent Bott,
in the course of your investigation, did you . . . come to an understanding of who was controlling
the account designated at ppgetaway@ymail.com?"  "A.  Yes."  "Q.  And who is that?"  "A.
Rodney  Chavez.");  Google  Subscriber  Information  at  1  (United  States'  Hearing  Exhibit
26)(providing that the name "Shadow Systems" owns the primary electronic mail transmission
address  "shadowsystems2010@gmail.com"  and  the  secondary  electronic  mail  transmission
address "ppgetaway@ymail.com"); Tr. at 43:22-44:2 (Anderson, Bott)(" Q. And do you know,
based on your investigation and, in fact, the review of electronic mail transmissions we've talked
about today, who controls the shadowsystems2010 electronic mail transmission account?"  "A.
Yes."  "Q. And who is that?" "A. Rodney Chavez.").

67.     Chavez was the sole proprietor of Shadow Systems.  See Letter and Seized Asset
Claim Form from Timothy M. Padilla, dated October 11, 2011 (United States' Hearing Exhibit
30).

68.     Church "does not have an e-mail account and that he doesn't even use the
computer." Tr. at 83:24-84:2 (Anderson, Bott).

**7.      Chavez and Ellis' Joint Venture.**

69.     Chavez and Ellis agreed to participate in a joint venture.  See Tr. at 99:15-16,
99:21-22 (Davis)("There's no question that they were partners in this transaction . . . . ").

70.     This joint venture intended to obtain title to PPG's properties from Lovato in exchange for an agreement that they would sell those properties and provide a certain return to Lovato based on a percentage of the PPG investors' original investment.

71.     The objective of Chavez and Ellis' joint venture was criminal in nature, and included conduct intended attempts to obtain money from investors based on fraudulent representations.

## PROCEDURAL BACKGROUND

On October 23, 2012, a federal grand jury indicted Chavez on twenty-one counts consisting of: (i) in Count 1, Conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343; (ii) in Counts 2-6, five counts of Wire Fraud in violation of 18 U.S.C. §§ 2, 1343; (iii) in Count 7, Conspiracy to commit Money Laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); (iv) in Counts 8-20, thirteen counts of Wire Fraud in violation of 18 U.S.C. §§ 2, 1956(a)(1)(B)(i); and (v) in Count 21, Wire Fraud in violation of 18 U.S.C. § 1957.  See Superseding Indictment at 6-11 (Doc. 91).  On January 7, 2013, the United States filed its Notice of Intention to Introduce Coconspirator Statements and Request for James Hearing, and attached fourteen pages of documents consisting of electronic mail transmissions from Chavez' co-Defendant, Joshua G. Ellis.  See Electronic Mail Transmissions at 1-14, filed January 7, 2013, as Attachment A to the Notice of Intention to Introduce Coconspirator Statements and Request for James Hearing.

At the James hearing, Chavez provided background information about the circumstances that led to Chavez' Indictment.  The United States explained that, in about 2004, two individuals, Michael Celenze and Gilbert Lovato, the latter who is "working with the Government through . . . this case," were involved with companies attempting to attract investors to invest in properties

in Puerto Peñasco, Mexico.  Tr. at 6:9-16 (Davis).  These investors provided funding to Lovato and Celenze in return for promissory notes.  <u>See</u> Tr. at 6:23-7:5 (Davis).  Lovato and Celenze promised the investors that they would receive rental payments, and eventually would get their investment back through ownership of the properties or otherwise.  <u>See</u> Tr. at 7:5-10 (Davis). Celenze received about $7,000,000.00, and used about $4,000,000.00 to purchase the properties in Puerto Peñasco, the circumstances surrounding which make up the basis of this lawsuit.  <u>See</u> Tr. at 7:11-19 (Davis).

In about 2010, when the real-estate market was collapsing, it became apparent that no one was renting the properties and that the investors were not going to get a return on their investments; Celenze was not to be found and had "[a]pparently taken off with a bunch of the money."  Tr. at 7:24-8:3 (Davis).  Chavez explained that he became involved around the fall of 2009 or the spring of 2010, when one of the investors, Richard Hole, asked him to "see what he could do about recovering the properties."  Tr. at 8:4-8 (Davis).

Chavez asserts that he and "his partner Wayne Church Jr.[,] who is the son of an old friend of his," and who "is involved in various real estate flipping jobs around town," agreed to work together to try to recover the properties in which Hole had invested.  Tr. at 8:9-22 (Davis). Chavez then found Ellis, who was "familiar with the real estate area down there" and was going to be "the boots on the ground" to help Chavez and Church sell the properties.  Tr. at 8:23-9:9 (Davis).  Other investors allegedly joined the effort, and then Lovato began to take the lead in representing the investors, employed Chavez, Church, and Ellis to assist in the sale of these properties, and arranged a sale that would "get a return . . . of about 30 cents on the dollar," but "[u]nfortunately none of this is in writing."  Tr. at 9:9-17 (Davis).  The sale never went through,

however, because the properties had been encumbered by HOA fees to the amount of "tens of thousands of dollars." Tr. at 9:17-22 (Davis). "[D]uring the course of about a year and a half . . . five or six of the properties were sold or attempted to be sold and approximately $847,000 from the sale of those properties ended in[] an account for Mr. [Chavez]." Tr. at 9:23-10:1 (Davis).

The Court asked for what Chavez thought the Court should listen during the hearing, to which Chavez responded that the Court should approach the testimony with the knowledge that Chavez had no experience with the real estate market, particularly in Mexico, before he began to try to work to regain the properties and ultimately sell them. See Tr. at 10:4-20 (Court, Davis). Additionally, Chavez pointed out that "one of the things that you will learn is that early on in the case in introducing himself to Gilbert Lovato and speaking to the investors on the various [telephone calls] . . . [Chavez] identifies himself as Wayne Church. He doesn't [identify] [himself] as Rodney Chavez." Tr. at 10:21-11:1 (Davis).

> Rodney Chavez identifies himself as his friend and co[-]defendant the in the case Wayne Church Jr. . . . Wayne Church is with him on many occasions when he's identifying himself as Wayne Church, but for reasons which aren't really important at this particular proceeding he was using the name Wayne Church instead of his own name Rodney . . . Chavez.

Tr. at 11:2-8 (Davis). Chavez also stated that "there is a substantial legal issue concerning the fact that . . . the people that loaned money to [Celenze] and Lovato have no . . . direct legal right to these properties, so any negotiations . . . were really sort of made without any legal basis for that." Tr. at 11:17-25 (Davis).

The United States responded that Chavez' lack of any real estate experience or knowledge required to sell these statements "is not really germane to the question of whether there's a conspiracy. . . . [A]s the Court has pointed out . . . there was an arrangement between

Mr. Chavez and Mr. Ellis.  I intend to put on evidence to suggest that it was criminal in nature."
Tr. at 12:17-23 (Anderson).  The United States asserted that "[t]he other point is discussing the
alias.  I mean[,] the Court obviously grabbed on to the idea why would Mr. Chavez conduct
business under an alias. I think it's an important point for the Court to consider."  Tr. at 12:24-
13:2 (Anderson).   According to the United States: "It's certainly a red flag" when someone
conducting an allegedly legitimate business is "using a pseudonym or protecting their identity
when they're doing it."  Tr. at 13:2-5 (Anderson).  In response to the Court's question whether
the co-Defendant Church has pled, the United States responded that he has and that his plea
agreement has been unsealed.  See Tr. at 13:10-16 (Anderson, Court).  The United States also
asserted that, while "the question of legal title . . . was raised," that issue does not "bear[] at all
on the idea of a conspiracy."  Tr. at 13:18-23 (Anderson).

After the Court took evidence on the United States' motion to admit the coconspirator
statements, the United States began it argument by pointing out that "the real central question
today is whether there was a conspiracy and whether Mr. Chavez and Mr. Ellis were members of
the conspiracy."  Tr. at 86:18-21 (Anderson).  The United States asserted that "it's really beyond
dispute that Mr. Ellis and Mr. Chavez were working together," as "[w]e certainly see Mr. Chavez
referring to Mr. Ellis as his partner in phone calls and vice versa."  Tr. at 86:22-87:1 (Anderson).
The United States noted: "Beyond that, . . . the evidence . . . today makes it clear that both Mr.
Chavez and Mr. Ellis entered this agreement with -- that it has a -- was, essentially, a criminal
objective."  Tr. at 87:4-7 (Anderson).

In response to the Court's question to which charge this evidence relates, the United
States stated that it relates to Count 1 -- the conspiracy to commit wire fraud charge.  See Tr. at

87:12-22 (Anderson, Court).  The Court asked the United States whether it contends that Celenze and Lovato were part of this same conspiracy, to which the United States responded that "they're certainly not part of this conspiracy."  Tr. at 87:23-88:4 (Court, Anderson).  The United States asserted that they intend to hold Lovato out at trial as a legitimate business person -- he owns a roofing company in Albuquerque, New Mexico -- who was trying to find an exit strategy for the properties.  See Tr. at 88:23-89:4 (Anderson).  The United States asserted that, as the managing director of the LLCs that held the title to the properties, he was a victim of the illegal conspiracy also.  See Tr. at 89:7-13 (Anderson).

The United States argued that Chavez' use of a false name when speaking to Lovato and to the other investors "is a red flag," as "it certainly suggests an effort to disguise identity and deceive."  Tr. at 89:15-20 (Anderson).  The United States argued that, to the extent there was evidence during the hearing that none of the investors relied on that name to invest, "that somewhat misses the point . . . . [T]he point was . . . that using a false name made it much more difficult for the investors . . . . [to learn] what's going on," as they did not know who to track down for answers.  Tr. at 89:21-90:11 (Anderson).  The United States asserted that "[t]he same is true for Agent Bott in conducting her investigation.  It took quite a while to figure out that Wayne Church is really an alias for the person who's at the center of this, which is Rodney Chavez."  Tr. at 90:12-15 (Anderson).  The Court asked why Church was "allowing another person to use his name."  Tr. at 90:19-20 (Court).  The United States responded: "Well, I think the answer is, Judge, because he was involved in a fraud. . . .  He's now pled guilty and acknowledges that that was the wrong thing to do."  Tr. at 90:21-24 (Anderson).  The United

States pointed out that Church has "come in and pled guilty to wire-fraud conspiracy," and noted

that it expects him to testify at trial. Tr. at 91:8-11 (Anderson, Court).

The United States also argued that the Court can find that these statements qualify as co-

conspirator statements based on "simply what happens to the proceeds of the properties" in

connection with the statements.  Tr. at 91:12-13 (Anderson).  The United States pointed out:

> You have about $850,000 that go into an account controlled by Mr.
> Chavez. Between Mr. Church and Mr. Ellis, they receive in excess of $200,000. I
> believe Mr. Ellis received about $65,000; Mr. Church received close to $200,000,
> I believe. But the salient point, Judge, is that the investors got nothing, not one
> penny went back to them, and I think that would have been certainly the final
> story had Agent Bott not obtained a warrant to seize the remaining proceeds of
> that account.

> At the same time as we see the money coming in and going out, we see a
> constant stream of lies to the investors, constant assurances that, oh, you'll get
> paid soon, it's almost getting done, the proceeds are there, I'm just waiting for
> other things to happen, this entire side story about we need more money to
> repatriate the funds.

> You heard Agent Bott testify, the funds never left the United States,
> Judge.  They went from an American buyer to a trust account in Arizona and from
> there into Mr. Chavez's account here in Albuquerque.  So the idea that they need
> funds to repatriate it, that they're using a Tequila company to move the money
> back into the United States, that is just pure fantasy.

> And I think we saw some of that in the electronic mail transmissions from
> Mr. Ellis where he's saying, hey, look, we could have something done tomorrow
> morning. Certainly, this idea that we need a broker to move this supposed $2
> million back and forth, that's -- that's all false, Judge.

Tr. at 91:13-92:14 (Anderson).  The United States argued that "the bookends of any fraud case

are who's lying and who's getting money.  And I see -- I think in this case we're seeing that on

both sides of the equation are Mr. Ellis and Mr. Chavez."  Tr. at 92:24-93:3 (Anderson).  The

United States asserted that Chavez and Ellis lied to the investors whether the properties had been

sold, where the money was located, when they would be paid, and whether Chavez and Ellis had

to repatriate the money first.  See Tr. at 93:3-8 (Anderson).  The United States noted: "So you've got a litany of lies, and then it's Mr. Chavez and Mr. Ellis who ultimately reap the windfall here."  Tr. at 93:8-9 (Anderson).

The United States also noted:

> [I]t's proper for the Court to consider Mr. Ellis's current status.  He is a fugitive, he is a -- he has spoken to Agent Bott on the phone, he's -- I believe he's promised to come in and speak to her.  From past comments from Mr. Davis, I'm quite sure Mr. Ellis knows that he's been named as a defendant in this Indictment. He remains a fugitive in Mexico. Beyond what Mr. Davis has told me, I have no understanding of his status or intentions, although I know this Indictment's been pending for a year and a half and he's made no . . . effort to come in and deal with these charges, so I think the Court can properly consider that in determining whether there is a conspiracy by a preponderance of the evidence.

Tr. at 93:13-22 (Anderson).

Chavez responded by noting that "[t]his is a confusing case with lots of facts, lots of players," and that "it lasted for many months," but asserted that "I am firmly convinced that the Government has not provided the Court with sufficient evidence by a preponderance of the evidence that they have established any conspiracy."  Tr. at 94:12-19 (Davis).  Chavez argued that it "doesn't make sense" that he was involved in this conspiracy to defraud, because "there's no indication that Mr. Chavez had any particular sophistication of selling real estate in Mexico," and because, "[a]s far as they knew, they weren't going to be able to get any money out of this property when they first met with Mr. Lovato and Mr. Lovato told them about this property in Mexico."  Tr. at 94:20-95:2 (Davis).  The Court asked whether Chavez' point was logical, because, if Chavez and Ellis stated that they were going to sell the property and provide the investors a thirty cent return, they probably intended to make more profit than that amount.  Tr.

at 95:3-8 (Court).   Chavez responded that he and Ellis worked for many months trying to understand the problems that these properties presented, and

> it was at that point after they did that then they realized that they could probably offer 30 cents on the dollar.  Not on the original investment, but, as the phone call makes clear . . . .  [but] [t]hirty cents on the dollar is after you sell the property and what you get for it.  The property was -- The values had gone down. It doesn't make any sense to pay 30 cents on the original investment. That doesn't make sense.

Tr. at 95:9-22 (Davis).

The Court asked whether Chavez' interpretation was a reasonable contention of the agreement that the investors were going to get thirty cents on the dollar, asking Chavez: "[D]oesn't that usually mean, if I'm going to take a haircut on something, that if I've paid a million dollars for a piece of property, I'm going to get $300,000?  . . . . Isn't that what it means, because property values are down, you're going to take . . . . a 30-percent haircut . . .?"  Tr. at 95:23-96:14 (Court).  Chavez responded that the problem here is that the property is in Mexico, and that an American citizen cannot own the property, and cannot just go "over here to Century 21 and sell[] some house in the northeast."  Tr. at 96:15-19 (Davis).  The Court asked: "But isn't that the only thing that really makes sense, is if -- if you're talking to investors, you're talking about what they put in?"  Tr. at 97:14-16 (Court).  Chavez argued that his interpretation made sense in the context of the problems with the properties, because if it had not been for Ellis and him, "they weren't going to get anything."  Tr. at 98:7-11 (Davis).  Chavez stated that, regardless of the meaning of the thirty-cents-on-the-dollar remarks, "I don't believe the Government's made sufficient evidence showing, Judge, of a conspiracy."  Tr. at 98:21-22 (Davis).

The Court asked: "Isn't your argument not that there wasn't a conspiracy? . . .  I think it's kind of hard to say that Church, Ellis and Chavez aren't working together.  Isn't your real

argument that they weren't -- this wasn't in furtherance of a crime?  Isn't that more your

argument here?"  Tr. at 98:23-99:5 (Court).  Chavez agreed with the Court that "[t]here's no

question that they were partners in this transaction" and stated that "[i]t's our position that there

is no criminal activity."  Tr. at 99:15-16, 99:21-22 (Davis).  Chavez asserted:

> And I don't believe they've presented any evidence of that. I mean, there's
> lots of electronic mail transmissions and lots of misunderstandings. I believe some
> of those electronic mail transmissions are taken out of context. Obviously, we'll
> have to deal with that at trial at some point, and I suppose the Court needs to take
> those at face value, but I ask the Court to understand that they're ambiguous, and
> I think it's -- I think the Court should be, you know, in a position of questioning
> the weight of the evidence with ambiguous electronic mail transmissions
> concerning when phone calls were made, because they weren't properly cataloged
> because they weren't being monitored by Ms. Bott. This was all done by Mr.
> Lovato, apparently on his own. So we don't know when the phone calls were
> made.

Tr. at 99:24-100:11 (Davis).  In response to the Court's inquiry whether Mr. Bowles asked

Lovato to record these telephone conversations, Chavez explained that he did not know, but that

Mr. Bowles has represented Lovato for a relatively long amount of time, beginning when the

United States indicted Celenze on tax fraud charges.  See Tr. at 100:12-101:24 (Court, Davis).

Chavez asserted, whereas the United States argues that "the investors got nothing" out of

these transactions, "that's because the government's sitting on $240,000 that they can certainly

get, which represents, basically, a third of the sale of the property."  Tr. at 102:10-14 (Davis).

Chavez also argued that the Court should not consider "the fact that Josh Ellis is a fugitive as

evidence of the conspiracy."  Tr. at 102:15-18 (Davis).  Chavez asserted that "there are a number

of reasons why he won't turn himself in," including that he has family in Mexico and that he

does not want to be placed in custody.  Tr. at 102:15-22 (Davis).

- 30 -

The United States reiterated that "Mr. Chavez's own statements in Exhibit 7" show that the thirty-cents-on-the-dollar remarks reflected "the total amount of the investment," because "the investment was close to $6 million," and Chavez' statements "reflect that the amount due to investors is $1.8 million."  Tr. at 103:7-17 (Anderson).  In response to the Court's question whether $6,000,000.00 was the amount invested, the United States responded that, while "Bott testified that it was closer to seven," "the salient point here is, Mr. Chavez's understanding was that it was close to $6 million."  Tr. at 103:18-24 (Court, Anderson).

The Court asked Chavez whether he is "going to say to the jury, if the Government just hadn't seized" the approximately $240,000.00, then "all these investors would have gotten their money."  Tr. at 104:17-20 (Court).  Chavez responded: "Right. . . .  It was $847,000.  And one-third of that was the 220 that they seized."  Tr. at 104:21-23 (Davis).  The United States asserted: "Well I think one-third is less than that, but it's hard to quibble with Mr. Chavez's own words, which is we owe $1.8 on 30 cents on the dollar. . . .  It speaks for itself."  Tr. at 104:25-105:3, 105:5 (Anderson).

On June 25, 2013, Chavez filed his Documents and Evidence to Supplement the <u>James</u> Hearing Record.  <u>See</u> Doc. 193 ("<u>James</u> Hearing Supp.").  Chavez attached excerpts from transcripts of five recorded telephone calls "made by Rodney Chavez (Wayne Church), to Gilbert Lovato."  <u>James</u> Hearing Supp. at 1.  According to Chavez, these attached transcripts "detail[] the conversation Mr. Chavez has with Mr. Lovato concerning his desire to give money from the sales of PPG Properties current & future, to either Jason Bowles, Mr. Lovato's attorney, or IRS Agent, Rebekah Bott."  <u>James</u> Hearing Supp. at 1.  Chavez points out that "[t]he phone calls are not dated," but he asserts that, "by their context, we are of the opinion that some of the

calls were made prior to Mr. Chavez' money being seized by the Government in July 2011." James Hearing Supp. at 1.  He further notes that, "[f]rom the Defendant's standpoint, it matters not that these discussions occurred before or after the seizure." James Hearing Supp. at 1.

On June 26, 2013, the United States filed the United States' Response to Defendant's Appendix/Supplement.  See Doc. 194 ("Supp. Response:").  The United States argues that, to the extent Chavez contends that these telephone calls support that he tried to give money to Bott or Mr. Bowles before the IRS' seizure of the bank accounts in July of 2011, this contention "finds absolutely no support in the text of the recorded phone calls."  Supp. Response at 1.  The United States asserts: "To the contrary, as set forth below, each of the calls cited by Defendant contains explicit evidence that such call occurred after the seizure of the funds from Defendant's bank account."  Supp. Response at 1 (emphasis in original)(citing Supp. Telephone Call No. 1960 at 8:6-7, 9:15-16; Supp. Telephone Call No. 1963 at 2:19-20, 10:21-22; Supp. Telephone Call No. 1965 at 3:17-18; Supp. Telephone Call No. 1967 at 3:3-4, 3:12-15; Supp. Telephone Call No. 1973 27:1-2).  The United States also argues that, "rather than suggesting an honest intention, the passages cited by Defendant are further evidence of lies and a clear intent to deceive."  Supp. Response at 2.  According to the United States:

> To note just one example, the Appendix cites numerous instances in which Defendant, acting under the assumed identity of Wayne Church, references an intention to put $1.1 million in Jason Bowles account to be paid out to the investors.  The evidence as adduced at the James hearing, however, makes clear that after the seizure, there were absolutely no proceeds remaining from the sale of the properties.  Rather, the fiction of $1.1 million was nothing more than a ruse designed to further the fraudulent scheme by lulling Lovato and the other investors into a false hope that they might yet see some recovery.

Supp. Response at 2 (citing Supp. Telephone Call No. 1963:3:8-11; Supp. Telephone Call No. 1965:2:8-11).

- 32 -

## LAW REGARDING COCONSPIRATOR STATEMENTS

The Federal Rules of Evidence define hearsay as "a statement that: **(1)** the declarant does not make while testifying at the current trial or hearing; and **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay evidence is not admissible. See Fed. R. Evid. 802. Some out-of-court statements, however, are specifically excluded from hearsay's definition and categorized as not hearsay. See Fed. R. Evid. 801(d). Among those categories are statements "by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Consequently, if coconspirator statements are relevant, they may be admitted into evidence. See Fed. R. Evid. 402 ("All relevant evidence is admissible.").

To admit out-of-court statements by coconspirators as non-hearsay under rule 801(d)(2)(E), "the United States must demonstrate by a preponderance of the evidence that: (i) a conspiracy existed; (ii) the declarant and the defendant were members of that conspiracy; and (iii)  the statements that the United States seeks to admit were made during the course and in furtherance of the conspiracy." United States v. Vigil, No. CR 05-2051 JB, 2006 WL 4109681, at *3 (D.N.M. Aug. 31, 2006)(Browning, J.)(citing United States v. Sinclair, 109 F.3d 1527, 1533 (10th Cir. 1997)). The Court may consider the coconspirator statements themselves, as well as independent evidence, in determining whether the conspiracy existed. See United States v. Lopez-Gutierrez, 83 F.3d 1235, 1242 (10th Cir. 1996)("In making its preliminary factual determination as to whether a conspiracy exists, the court may consider the hearsay statement sought to be admitted, along with independent evidence tending to establish the conspiracy.")(citing Bourjaily v. United States, 483 U.S. 171, 181 (1987)). "[T]here need only

be some independent evidence linking the defendant to the conspiracy." United States v. Lopez-Gutierrez, 83 F.3d at 1242 (internal quotations and citations omitted).  This "independent evidence may be sufficient even when it is not 'substantial.'"  United States v. Lopez-Gutierrez, 83 F.3d at 1242 (internal citation omitted).  The United States Court of Appeals for the Tenth Circuit has noted: "We have defined independent evidence as evidence other than the proffered coconspirator statements themselves."  United States v. Lopez-Gutierrez, 83 F.3d at 1242 (internal quotation marks and alterations omitted)(quoting United States v. Martinez, 825 F.2d 1451, 1451 (10th Cir. 1987)).

"[I]t is not necessary for the United States to show that proffered statements were made during the time in which [the defendant] was a member of a conspiracy." United States v. Vigil, 2006 WL 4109681, at *5 (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 393 (1948) ("With the conspiracy thus fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy, become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy.")).  Moreover, a newcomer to a conspiracy assumes the risk for what has already happened in the course of the conspiracy.  See United States v. Brown, 943 F.2d 1246, 1255 (10th Cir. 1991)("The fact that appellant may have joined the conspiracy after its inception does not make his co-conspirators' previous statements inadmissible."); United States v. Adamo, 882 F.2d 1218, 1230-31 (7th Cir. 1989)(holding one who joins and participates in a conspiracy "adopt[s] the previous acts and declarations of his fellow co-conspirators").

In determining the admissibility of coconspirator statements, "[t]he strongly preferred order of proof" is for the district court to hold a hearing "outside the presence of the jury to

determine by a preponderance of the evidence the existence of a predicate conspiracy." United States v. Urena, 27 F.3d at 1487, 1491 (10th Cir. 1994). A defendant does not possess a right to a pretrial hearing on admissibility of coconspirators statements; however, "a district court can only admit coconspirator statements if it holds a James hearing or conditions admission on forthcoming proof of a 'predicate conspiracy through trial testimony or other evidence.'" United States v. Townley, 472 F.3d 1267, 1273 (10th Cir.2007)(quoting United States v. Owens, 70 F.3d 1118, 1123 (10th Cir.1995)).

This flexibility recognizes the Tenth Circuit's understanding that it is not always practical for the United States to make a showing that a conspiracy existed before admitting specific evidence at trial. See United States v. Peterson, 611 F.2d 1313, 1330 (10th Cir. 1979)(noting that the admissibility determination contemplates presentation of requisite conspiracy evidence before or during the United States' case in chief).

In United States v. Vigil, the Court did not hold a James hearing, because the defendant, Robert Vigil, had already been tried once, ending in a hung jury, and the Court concluded that "the evidence that" the Honorable James A. Parker, Senior United States District Judge for the District of New Mexico, "admitted at the first trial satisfies the preponderance standard on the basis of the transcripts of the first trial's testimony." 2006 WL 4109681, at *4. Vigil was charged, among other charges, with being a member of a conspiracy to commit RICO violation, and the United States moved the Court to permit it to elicit non-hearsay coconspirator statements in Vigil's retrial. See 2006 WL 4109681, at *1. The Court noted that it had previously found, in deciding Vigil's rule 29 motion for acquittal, that "'a reasonable jury could have found that Vigil agreed with at least one other person to conduct or participate in the affairs of the enterprise

through a pattern of racketeering activity, or knowingly and voluntarily participated in the conspiracy.'"  2006 WL 4109681, at *4 (citing United States v. Vigil,  No. CR 05-2051 JB, Memorandum Opinion, filed Aug. 7, 2006 (Doc. 268)).

In support of its determination that the United States had met its burden to prove that Vigil participated in the existent conspiracy, the Court pointed to testimony asserting that Garcia, an alleged coconspirator, "told Vigil that he would set up the same arrangement with Vigil as with Montoya, Vigil learned about the prior arrangement with Montoya through Garcia, Vigil indicated that he intended to continue the fee-sharing arrangement that Montoya had set up, and Vigil threatened to withhold the SLOM contract from Everage."  2006 WL 4109681, at *4 (internal quotation marks and citations omitted).  The Court reasoned that "[p]roof of the existence of a conspiracy is often based on circumstantial evidence, and this testimony is sufficient to establish Vigil's participation in a conspiracy by a preponderance of the evidence."  2006 WL 4109681, at *5.  The Court thus concluded that it would "permit the United States to elicit from its witnesses at trial co-conspirator statements made in furtherance of the conspiracy charged."  2006 WL 4109681, at *6.

## LAW REGARDING CONSPIRACY

The Tenth Circuit has outlined what the government must prove to establish the existence of a conspiracy:

> To prove a conspiracy, the government must show: (1) that two or more people agreed to violate the law[,] (2) that the defendant knew at least the essential objectives of the conspiracy, (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged co-conspirators were interdependent. . . . A single conspiracy does not exist solely because many individuals deal with a common central player.  What is required is a shared single criminal objective, not just similar or parallel objectives between similarly situated people.  On the other hand, a defendant need not have knowledge of all the details or all the

members of the conspiracy and may play only a minor role in the conspiracy. The government need only prove by direct or circumstantial evidence that the defendant knew at least the essential objectives of the conspiracy and the defendant knowingly and voluntarily became part of it.

United States v. Small, 423 F.3d 1164, 1182-83 (10th Cir. 2005)(quoting United States v. Evans, 970 F.2d 663, 668-671 (10th Cir. 1992), and United States v. Mendoza-Solgado, 964 F.2d 993, 1005 (10th Cir. 1992))(internal citations, quotations, and emphasis omitted). Conspiracy is not a collection of various separate and distinct events, but rather is "the prototypical continuing offense." United States v. Acosta-Gallardo, 656 F.3d 1109, 1122 (10th Cir. 2011)(quoting United States v. Jaynes, 75 F.3d 1493, 1505 (10th Cir. 1996)). "'A conspirator is only liable for the acts of co-conspirators until the conspiracy accomplished its goals or that conspirator withdraws.'" United States v. Thornburgh, 645 F.3d 1197, 1204 (10th Cir. 2011)(quoting United States v. Cherry, 217 F.3d 811, 817 (10th Cir. 2000)), cert. denied, 132 S. Ct. 214 (2011).

## RELEVANT LAW REGARDING WIRE FRAUD

Section 1343 of Title 18 of the United States Code makes it a federal crime to devise or intend to devise a scheme to defraud and transmit that scheme by means of wire, radio, or television communication:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1343.  The crime of wire fraud consists of three elements: "'Conviction for wire fraud under 18 U.S.C. § 1343 requires (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of interstate wire or radio communications to execute the scheme.'" United States v. Gordon, 710 F.3d 1124, 1147 (10th Cir. 2013)(quoting United States v. Ransom, 642 F.3d 1285, 1289 (10th Cir. 2011)).

A "'scheme to defraud focuses on the intended end result and affirmative misrepresentations are not essential; by contrast a scheme to obtain money by false pretenses, representations or promises focuses instead on the means by which the money is obtained and particular false pretenses, representations or promises must be proved.'"  United States v. Gallant, 537 F.3d 1202, 1228 (10th Cir. 2008)(quoting United States v. Cochran, 109 F.3d 660, 664 (10th Cir. 1997)).  "Fraudulent intent is required under the statute;" while "nondisclosure is not actionable as fraud absent a duty to speak," "a misleading omission is 'actionable as fraud if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled.'" United States v. Gallant, 537 F.3d at 1228 (quoting United States v. Cochran, 109 F.3d at 665).

## ANALYSIS

The United States seeks to admit pre-trial, as coconspirator statements under rule 801(d)(2)(E) of the Federal Rules of Evidence, certain electronic mail transmissions that Ellis received and sent concerning the properties that Chavez and Ellis represented they would sell on the PPG investors' behalf.  The United States asserts that Ellis' statements in the electronic mail transmissions were made during and in furtherance of their conspiracy to commit wire fraud.

The Court held a <u>James</u> hearing on Jun 18, 2013, to determine whether the United States has shown by a preponderance of the evidence that: "(i) a conspiracy existed; (ii) the declarant and the defendant were members of that conspiracy; and (iii) the statements that the United States seeks to admit were made during the course and in furtherance of the conspiracy." <u>United States v. Vigil</u>, 2006 WL 4109681, at *3. Chavez conceded at the hearing that Ellis and Chavez were business partners, and stated that the important issue he contests is whether a conspiracy existed, because he contends that no criminal enterprise existed. <u>See</u> Tr. at 99:15-16, 99:21-22 (Davis)("There's no question that they were partners in this transaction . . . . It's our position that there is no criminal activity."). The Court concludes, however, that the United States has, by a preponderance of the evidence, that a criminal conspiracy to commit wire fraud existed, that Chavez and Ellis were members of this conspiracy, and that Ellis made his statements in the electronic mail transmissions in furtherance of the conspiracy.

"Conviction for wire fraud under 18 U.S.C. § 1343 requires (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of interstate wire or radio communications to execute the scheme." <u>United States v. Gordon</u>, 710 F.3d at 1147 (internal quotation marks and citation omitted). Because the charge against Chavez is not just wire fraud, but conspiracy to commit wire fraud, the United States must prove by a preponderance of the evidence that Chavez "knew at least the essential objectives of the conspiracy," and that he "knowingly and voluntarily became a part of" the conspiracy. <u>United States v. Small</u>, 423 F.3d at 1182.

In addition, as the Tenth Circuit pointed out in <u>United States v. Blair</u>, 54 F.3d 639, 642 (10th Cir. 1995), "conspiracy is a specific intent crime." 54 F.3d at 642. "'The specific intent

required for the crime of conspiracy is in fact the intent to advance or further the unlawful object

of the conspiracy,'" rather than the intentional violation of a known duty. United States v. Blair,

54 F.3d at 642-43 ("Specific intent crimes do not, as a rule, necessitate a showing the defendant

intentionally violated a known legal duty.").  The Tenth Circuit has pointed out that this rule is

because ignorance of law is not a defense:

> [T]he general rule, "deeply rooted in the American legal system," is "that
> ignorance of the law or a mistake of law is no defense to criminal prosecution and
> is one that has been applied by the United States Supreme Court in numerous
> cases construing criminal statutes." Thus, a specific intent crime "normally does
> not necessitate proof that the defendant was specifically aware of the law
> penalizing his conduct."

United States v. Blair, 54 F.3d at 643 (internal citations and original alterations omitted)(quoting

Cheek v. United States 498 U.S. 192, 199 (1991); United States v. Scanio, 900 F.2d 485, 489 (2d

Cir. 1990)).

   The Court concludes that Ellis' statements qualify as coconspirator statements, because

the United States has proved, by a preponderance of the evidence, that the venture in which

Chavez concedes that he and Ellis agreed to participate as partners was criminal in nature.  The

most damaging evidence that the United States presented against Chavez at the James hearing

was the bank account records, which show that the money was in the United States, in Chavez'

bank accounts, and that Chavez' friends and family, and his other business, withdrew the money

from those accounts, as it appears, without the investors' consent or even knowledge.  Moreover,

during and after the money was withdrawn from the accounts, Chavez -- holding himself out to

be Church -- and Ellis represented to the investors that the money is there waiting to be

disbursed, or that it is stuck in Mexico and needs to be repatriated.  Chavez' bank records

contradict those statements.  Thus, looking at the bank account statements and Ellis' electronic

mail transmissions to the investors only, which he immediately forwarded to Chavez, a preponderance of the evidence establishes that Ellis sent these electronic mail transmissions -- by means of wires -- to investors intending to obtain money from them based on the apparently fraudulent misrepresentation that he needed money "to bring the money back to the U.S."  "FW: Wayne Church" at 1.  The United States has therefore shown that Ellis at least intended to commit wire fraud.  See United States v. Gordon, 710 F.3d at 1147 ("Conviction for wire fraud under 18 U.S.C. § 1343 requires (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of interstate wire or radio communications to execute the scheme.").

In addition to Chavez' concession at the hearing that he worked with Ellis in these transactions, there are two pieces of evidence that, by a preponderance of the evidence, show that Chavez was involved in these apparently fraudulent attempts to defraud the investors with regard to repatriating the money.  First, that Ellis, signing the electronic mail transmissions that he sent to investors as Church, forwarded each of these electronic mail transmissions to Chavez.  In connection with Chavez' admissions that he represented himself to Lovato as Church throughout their telephone conversations, see Trial Stipulation at 1, Ellis signing the electronic mail transmissions soliciting money from the investors based on apparently false pretenses -- which he immediately forwarded to Chavez -- evinces "the intent to advance or further the unlawful object of the conspiracy.'"  United States v. Blair, 54 F.3d at 642-43.  Second, in response to one of Ellis' electronic mail transmissions, Chavez tells him not to ever use his name in electronic mail transmissions:

> Brother, get at me early to get that money and we need to get on it tomorrow make it a good day plus stay safe out there for the holidays.  Your right lets sell

> everything but casa 16 I want to find some nice properties for us.  Do you think
> Brett is real with that Puerto Vallarta deal I want that house bad.  Oh <u>don't use my
> name on the computer ever</u> thanks.

"Money" at 1 (emphasis added).  That Chavez does not want his name to be used "ever" on the computer evinces some level of a guilty conscience, as it shows that he wants to keep himself distant from their activities.  "Money" at 1.  The Court concludes that it is more likely than not that he wanted to keep himself distant from these electronic mail transmissions asking for money, because, as the bank account statements reflect, he knew that these electronic mail transmissions purporting to be from Church were attempting to obtain money from the investors based on the false premises that the money was stuck in Mexico.  Thus, the Court concludes that the United States has proved by a preponderance of the evidence that the electronic mail transmissions it seeks to admit are statements that Chavez' coconspirator made during their conspiracy to defraud the investors.  The Court therefore finds that the United States may properly admit these statements at trial under the hearsay definition's exclusion for coconspirator statements.  <u>See</u> Fed. R. Evid. 801(d)(2)(E) (excluding from the hearsay definition statements made  "by the party's coconspirator during and in furtherance of the conspiracy").

Chavez argues that there are two reasons why the Court should not find that a preponderance of the evidence establishes that his and Ellis' conduct was criminal.  First, he contends that the agreement that he made with investors was for thirty cents on the dollar for whatever he could sell the properties, rather than thirty cents on the dollar of the investors' original investment.  The Court, however, is unconvinced.  Such an agreement is not logical or prudent for either the investors, or for Chavez and Ellis.  In the face of such an agreement, there is little incentive for Chavez to get the best price that he can for the properties.  No matter at

what price he sells the property, he comes out ahead, and the investors are thus facing a much greater risk than Chavez.  For example, if the investors invested $6,000,000.00, and Chavez sells the properties for $1.8 million, Chavez makes $1.26 million and the investors make $540,000 total.  They have thus made just nine cents for every dollar, rather than the thirty cents for every dollar that they intended.  Put another way, if the thirty investors all put in equal amounts, they each get back $18,000.00 of their original investment and Chavez, having not invested any money and having arranged only to sell the properties, made $1.26 million.  It is unlikely that a reasonable investor would take that exit strategy.

Chavez' interpretation of the oral agreement contrasts with the common-sense way to understand an agreement that the investors would sell their properties for thirty cents on the dollar.  Using the same numbers, if Chavez sells the properties for $1.8 million, the property owners all receive thirty cents, rather than nine cents, on their original investments, and Chavez receives nothing.  If, however, Chavez can sell the properties for any price above that, even if that price is only two million dollars, the investors still receive their promised price of thirty cents on the dollar, and Chavez receives whatever amount above that $1.8 million he can get.  It takes neither a mathematician nor an investment banker to follow the logic and understand what Chavez meant when he said that "the magic number for everybody was 30 cents on the dollar, which was agreed upon by us to make sure that that's what we collected for everybody to be happy."  Feb. 2011 Call at 11:7-9 (Chavez).  It also makes more sense as to why, rather than talking about different amounts the investors would get back at different sales prices, Chavez continually tells the investors that, since the original investment amount "was close to $6 million," Feb. 2011 Call at 31:6 (Chavez), the "magic number for us" is "$1.8 million."  Feb.

2011 Call at 19:13-15 (Chavez)("So that's the magic number for us.  And that's not a -- that's not a small figure by no means on that beach right now to come up with a-million-eight.").  <u>See</u> Feb. 2011 Call at 19:17-19 (Chavez)("[I]t's not a small figure by no means to sell everything on that beach and to come up with the a-million-eight."); Feb. 2011 Call at 30:18 (Chavez)("We owe 1.8 million at 30 cents on the dollar.").

The second reason that Chavez argues with regard to why the Court should not find that "there is no criminal activity," in Ellis and Chavez' arrangement, Tr. at 99:21-22 (Davis), is found in the telephone call evidence that he submits in which he discussed with Lovato sending the rest of the proceeds to Bott or to Mr. Bowles.  Given that the United States shoulders the burden here, Chavez had no obligation to present any evidence at the <u>James</u> hearing, but he nevertheless did so through supplementing the record afterwards.  <u>See</u> <u>James</u> Hearing Supp. at 1-3.  He submitted to the Court statements that he made to Lovato during telephone conversations -- still representing that he was Church -- with regard to sending the rest of the proceed money to Bott or Mr. Bowles.  Chavez presents these statements "concerning his desire to give money from the sales of PPG Properties . . . to either Jason Bowles, Mr. Lovato's attorney, or IRS Agent, Rebekah Bott," intending that the statement support finding that his conduct was lawful, and that he never intended to defraud the PPG investors.

The Court does not, however, find that these statements help Chavez as much as he may think.  Chavez points out that "[t]he phone calls are not dated," but he asserts that, "by their context, we are of the opinion that some of the calls were made prior to Mr. Chavez' money being seized by the Government in July 2011."  <u>James</u> Hearing Supp. at 1.  He further notes that, "[f]rom the Defendant's standpoint, it matters not that these discussions occurred before or after

- 44 -

the seizure." <u>James</u> Hearing Supp. at 1. The Court disagrees with both assertions, as the statements seem to make sense only if they took place after the IRS' seizure of the bank account funds. The Court also concludes that this timing matters for purposes of finding whether there was criminal activity.

The Court concludes that these telephone conversations took placed after the seizure of the funds, because in two of the five calls, he mentions sending the money to Bott, the IRS agent who seized the money, and in the other three, which appear to take place very close together in time, he talks about putting the money in Mr. Bowles' trust account. The Court concludes that these conversations about putting the money in Mr. Bowles' account took place after the seizure, because in Supp. Telephone Call No. 1963, the telephone conversation in which he first proposes placing the money in Mr. Bowles' account, he provides as an alternative option, putting the money in "the other account that was seized." Supp. Telephone Call No. 1963 at 2:20 (Chavez). Because the other two conversations discussing Mr. Bowles discuss his rejection of the request to put the money in his trust account, the Court concludes that all of these conversations also took place after the IRS' seizure of the funds.

The timing of these conversations is important, because that Chavez wanted to put the money in the IRS' hands or in the hands of Lovato's attorney after the IRS already seized the funds in his bank accounts is not probative of innocent conduct. On the one hand, it is possible that Chavez believed that his conduct up to that point was innocent, and that he was trying to do the right thing by providing the money to law enforcement, or to an attorney who may be able to facilitate some sort of arrangement with law enforcement in relation to the funds.

On the other hand, the Court believes that it is more likely that, having discovered that the IRS seized the funds in his bank accounts, Chavez knew the jig was up.  A criminal who just found out that law enforcement discovered his or her criminal scheme, especially at a point at which law enforcement had developed sufficient proof in its investigation to seize the criminal's funds, likely knows that he or she is all but caught, and would likely see handing the funds off to a law enforcement officer or to a lawyer as the best way to appear innocent.  If Chavez was innocent, and the IRS wrongly seized the funds, it seems logical to call the IRS and ask what to do with future proceeds, rather than to deceive the IRS and risk further criminal penalties. Chavez specifically rejected, however, Lovato's suggestion that Chavez so proceed:

> GILBERT LOVATO: . . .  Here's what I'm going to suggest to you.  Okay?  I would call Rebekah Bott and tell her, "Look, I" --
>
> WAYNE CHURCH:  No, I'm not going to call her.  I'm going to do no such thing.
>
> GILBERT LOVATO:  No, no, no.  Listen, listen. Listen.
>
> WAYNE CHURCH:  -- no such thing.
>
> GILBERT LOVATO:  Listen.
>
> WAYNE CHURCH:  She will not talk to me.

Supp. Telephone Call No. 196- at 7:13-23 (Lovato, Chavez).  The Court therefore concludes that these conversation, which took place after the IRS had already seized the money in Chavez' accounts, do not counsel against finding that Chavez and Ellis agreed upon conduct was criminal in nature.

To say that these telephone conversations do not push the evidence in Chavez' favor with regard to whether Chavez and Ellis were involved in a conspiracy to commit wire fraud is not to

say that these telephone conversations are of no help to Chavez.  These telephone conversations, while not sufficient to overcome the United States' proof that, by a preponderance of the evidence, Ellis and Chavez had an agreement that was criminal in nature, may nevertheless cut against the United States' theory at trial.  In their Supp. Response, the United States contends that "the fiction of $1.1 million was nothing more than a ruse designed to further the fraudulent scheme by lulling Lovato and the other investors into a false hope that they might yet see some recovery."  Supp. Response at 2.  If indeed Chavez believed that he was about sell some of PPG's properties and receive in return $1.1 million, although it may cut against his argument about thirty cents on the dollar of whatever price he could get for the properties, it may help to explain some of the more damaging evidence of the withdrawals from his bank accounts.  This evidence, if true, supports a theory that the withdrawals from his bank accounts by him, his family, and his friends, and Ellis were part of his effort to sell the entire PPG portfolio and end up with an amount that provides thirty cents on the dollar to the investors.  It is well known and true that one has to spend money to make money.  And that notion may explain those withdrawals.

Additionally, to the extent that Chavez continued to reiterate in these phone calls with Lovato about sending the money to either Bott or Mr. Bowles that he still intended to get paid, even after the IRS seized the money, this self-interest likely helps his theory that his conduct -- at least in his mind -- was lawful.  Whereas the Court concludes that a criminal who has all but been caught might try to hand the money off in the appearance of innocence, it seems as though the criminal would want to appear as innocent as possible and represent that the investors should be paid before the criminal.  Chavez, however, in these telephone conversations about sending

the money to Bott or Mr. Bowles, keeps his interest in being paid first and foremost.  See, e.g.,

Supp. Telephone Call No. 1963 at 3:10-16 (Chavez)("I need [Mr. Bowles] to know that he has to

have disbursal agreements for my money . . . .  I just need disbursal agreement for mine, and then

he can disburse the rest as the way he wants."); Supp. Telephone Call No. 1965 at 4:1-6

(Chavez)("[W]e'd like to get disburse letters, of course, for us to make sure we get paid. . . .

Because we're not saints.  We don't do this for free, Mr. Lovato, You understand?").

        The Court nevertheless concludes that Ellis' electronic mail transmissions, Chavez' reply

electronic mail transmissions, Chavez' representations on the Feb 2011 Call, and especially the

bank account statements establish, by a preponderance of the evidence, that Chavez and Ellis

conspired to commit wire fraud.  Perhaps the conspiracy did not extend to the amount of money

that the United States contends at this point, but Chavez and Ellis conspired to defraud the

investors to some extent, and that is enough to find that Chavez' statements in the electronic mail

transmissions to investors and to Chavez are admissible non-hearsay coconspirator statements.

The Court therefore concludes that Ellis' statements in the electronic mail transmission are

admissible, and will grant the United States' motion to admit these statements against Chavez.

        **IT IS ORDERED** that Plaintiff United States of America's Notice of Intention to

Introduce Coconspirator Statements and Request for James Hearing, filed January 7, 2013 (Doc.

107), is granted.  The statements of Defendant Joshua Ellis, Defendant Rodney Chavez' co-

Defendant, in the electronic mail transmissions that Plaintiff United States of America seeks to

introduce at trial are admissible, under rule 801(d)(2)(E) of the Federal Rules of Evidence, as

non-hearsay coconspirator statements.

UNITED STATES DISTRICT JUDGE

Counsel:

Kenneth J. Gonzales
   United States Attorney
John C. Anderson
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

Michael V. Davis
Albuquerque, New Mexico

        *Attorney for Defendant Rodney Chavez*